# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-04-00811-CV

**Eric H. Scheffey, Appellant**

v.

**Mike Geeslin, Commissioner of Insurance of the Texas Department of Insurance[1] and Texas Medical Liability Insurance Underwriting Association, Appellees**

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 167TH JUDICIAL DISTRICT
NO. 93-13647, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Eric Scheffey is an orthopedic surgeon who obtained professional liability insurance from the Texas Medical Liability Insurance Underwriting Association ("JUA"). After the JUA settled several claims that had been filed against Scheffey, it informed him that in order to renew his policy, he would have to pay a surcharge. Scheffey appealed the JUA's decision, and the Commissioner of the Texas Department of Insurance ("Commissioner") issued an order stating that the surcharge was proper. Scheffey appealed the Commissioner's order, and the district court affirmed the order. Scheffey appeals the judgment of the district court, contending that the JUA did not have the authority to impose the surcharge or, alternatively, that the surcharge did not comply

---

[1] At the time this case was tried, the notice of appeal cited Edna R. Butts was the Interim Commissioner of Insurance, and Glorial Leal was the Temporary Acting Commissioner of Insurance. However, Mike Geeslin now the current Commissioner of Insurance.

with the relevant statutory requirements. In addition, Scheffey argues that the Commissioner's order was not supported by substantial evidence. We will affirm the judgment of the district court.[2]

## BACKGROUND

The JUA is a joint underwriting association created by statute (the "JUA Act") to provide insurance for health-care providers who are unable to obtain coverage in the voluntary market. *See* Act of May 29, 1975, 64th Leg., R.S., ch. 331, § 1, 1975 Tex. Gen. Laws 867, 867, *amended by* Act of March 30, 1977, 65th Leg., R.S., ch. 59, §§ 1-3, 1977 Tex. Gen. Laws 129, 129, *amended by* Act of May 30, 1977, 65th Leg., R.S., ch. 817, §§ 31.03-.12, 1977 Tex. Gen. Laws 2039, 2057, *amended by* Act of May 30, 1981, 67th Leg., R.S., ch. 829, § 1, 1981 Tex. Gen. Laws 3159, 3159 (creating JUA) ("Former Tex. Ins. Code art. 21.49-3"), *repealed by* Act of May 24, 2005, 79th Leg., R.S., ch. 727, § 18, 2005 Tex. Gen. Laws 1752, 2186 (current version at Tex. Ins. Code Ann. §§ 2203.001-.406 (West Supp. 2007)). The JUA consists of all insurers authorized to write liability insurance in Texas and is designed to be a self-supporting association. *Id.* § 3(a). The JUA has the power to issue insurance policies on behalf of the insurance companies that are its members. *Id.* § 3(b).

At the time relevant to this appeal, Eric Scheffey had coverage through the JUA for his work as an orthopedic surgeon. Although the amount of his coverage varied over the years, Scheffey had continuous coverage through the JUA from 1985 to 1993.

As the result of services he provided in the 1980s, several claims were filed against Scheffey. When contemplating the possibility of settling the suits, Scheffey was informed of the

---

[2] On appeal, the Commissioner adopts by reference the entirety of the JUA's briefing. *See* Tex. R. App. P. 9.7 (proving that "Any party may . . . adopt by reference all or any part of a brief . . . by another party in the same case").

2

possibility of spreading the settlements over several policy periods in order to prevent exhausting his coverage in any one year. Although Scheffey acknowledges that he was informed that settling his claims might lead to a premium increase, he argues that he was not told how the increased premium would be calculated.

The first claim against Scheffey was filed by Pete Dunstan and was settled for $2,250,000. The settlement was spread over several policy periods and paid out in three installments of $750,000. The second claim was filed by Ron Hardman and was settled for $1,000. The final claim was filed by Jose Oseguera and was settled for $925,000. As with the Dunstan case, this settlement was spread over more than one policy period and paid out in two installments of $462,500.

After the claims were settled but before the expiration of Scheffey's 1992 policy, the JUA sent Scheffey a renewal letter. At that time, Scheffey had a policy providing coverage of $200,000 per occurrence and $600,000 total annual coverage. The letter stated that to renew his coverage, Scheffey would have to pay a premium of $63,286. In addition to the premium, the renewal letter also specified that because of his recent claim settlements, Scheffy would be required to pay a surcharge.

The possibility that a policyholder might have to pay a surcharge was specifically mentioned in all of the renewal applications Scheffey had signed since obtaining coverage through the JUA. In particular, the applications contained the following clause:

> The undersigned further recognizes and agrees that such insurance as is applied for herewith is subject to such rates, premium modifications, *surcharges* and policyholder's stabilization reserve fund charges as are now or may hereafter be approved by the Texas State Board of Insurance. (Emphasis added.)[3]

---

[3] In his testimony, Scheffey admitted that he was aware that all of the applications contained the previously quoted language.

Along with the renewal letter, the JUA also sent Scheffey a copy of the schedule that the JUA uses when calculating surcharges. Under the terms of the schedule, the JUA imposes a surcharge on a policyholder when it has had to pay three or more indemnity claims on behalf of a physician within the past four years. The surcharge is expressed as a percentage of a policyholder's annual premium. For example, a 100% surcharge would mean that a policyholder would have to pay the total value of his annual premium as a surcharge.

The amount of the surcharge is determined by considering the number and the amount of all the claims paid on behalf of the policyholder over the previous four years. The schedule lists five different percentage amounts depending on the value of the claim paid. The total surcharge is determined by adding the various percentages for each of the claims paid. The schedule provides as follows:

| For Claims Paid | Accompanying Percentage |
|---|---|
| Between $0 to $4,999 | 0% |
| Between $5,000 to $24,999 | 25% |
| Between $25,000 to $49,999 | 50% |
| Between $50,000 to $99,999 | 100% |
| Between $100,000 and up | 150% |

The schedule also describes an additional charge—a "frequency surcharge"— that might be imposed, which is based on the number of claims paid regardless of the value of the claim. The relevant language specifies that "after a third claim, regardless of size, has been paid within the

4

four (4) year period, in addition to any other surcharge(s), an additional surcharge of 25% for each claim paid over two (2) will be charged for frequency."

When calculating Scheffey's surcharge, the JUA treated each settlement payment as a separate claim. In other words, because some of the settlements paid on behalf of Scheffey had been divided into separate payments and spread over more than one policy period, the JUA treated each payment as a separate claim. Under the JUA's analysis, they had paid six claims on behalf of Scheffey. The JUA also concluded that because, under its analysis, the total number of claims paid was more than two, a frequency surcharge should be imposed. After performing its calculation, the JUA determined that Scheffey would have to pay a $537,931 surcharge in order to renew his policy. The following chart illustrates how the surchage was calculated:

| Plaintiff | Amount Paid | Amount of Surchage |
|---|---|---|
| Dunstan | $750,000 | 150% |
| Dunstan | $750,000 | 150% |
| Dunstan | $750,000 | 150% |
| Hardman | $1,000 | 0% |
| Oseguera | $462,500 | 150% |
| Oseguera | $462,500 | 150% |
| Frequency, over 2 | (4 * 25%) | 100% |
| Total Surcharge | | 850% |
| Renewal Premium ($63,286) * 850% = | | $537,931 |

Scheffey appealed the imposition of the surcharge to the JUA's board of directors, who affirmed the decision to impose the additional charge. Scheffey then appealed the JUA's decision to the Commissioner, who, in light of the fact that the surcharge was being appealed, temporarily suspended Scheffey's obligation to pay the surcharge as a condition to renewing his policy.

After the JUA sent the renewal letter and after the Commissioner suspended the surcharge, the JUA sought permission from the Deputy Commissioner of Casualty Insurance ("Deputy Commissioner") to impose the surcharge on Scheffey. The JUA formalized this request by filing an (a) rate application, which is an application that an insurer files when it wants to charge an individual policyholder a rate that is different than the standard rate typically charged.[4] The JUA attached a copy of the surcharge schedule to the (a) rate application. After reviewing the application, the Deputy Commissioner approved the application and the proposed surcharge.

Scheffey appealed both the Deputy Commissioner's decision to approve the (a) rate application and the JUA's decision to impose a surcharge, and a hearing was held before the Commissioner. *See* Former Tex. Ins. Code art. 21.49-3, § 7; *see also* 28 Tex. Admin. Code § 1.705 (2007) ("Any person affected by any action taken by an associate or deputy commissioner under this subchapter may petition the commissioner for a hearing to review the matter"). After hearing testimony and reviewing the evidence presented, the Commissioner issued an order affirming the Deputy Commissioner's approval of the (a) rate application and affirming the decision to impose a surcharge.

---

[4] According to the JUA, when it determined that it was necessary to impose a surcharge on a policyholder, it typically sent a policyholder a renewal letter specifying the amount of the surcharge and then filed an (a) rate application seeking approval from the Deputy Commissioner.

Soon thereafter, Scheffey appealed the Commissioner's order to the district court, and the district court affirmed the order. *See* Tex. Ins. Code Ann. §§ 36.201 (specifying that Commissioner's orders are subject to judicial review), .202 (explaining that dissatisfied party may seek judicial review of Commissioner's action), .203 (providing that judicial review of Commissioner's action is under substantial evidence rule) (West 2007). Scheffey appeals the judgment of the district court. *See id.* § 36.205 (West 2007) (specifying that party may appeal district court's judgment to appellate court).

**STANDARD OF REVIEW**

Many of the issues raised in this case involve statutory construction, which is a question of law that is reviewed de novo. *See Bragg v. Edwards Aquifer Auth.*, 71 S.W.3d 729, 734 (Tex. 2002); *USA Waste Servs. of Houston, Inc. v. Strayhorn*, 150 S.W.3d 491, 494 (Tex. App.—Austin 2004, pet. denied). In construing a statute, we must ascertain the legislature's intent in enacting the statute. *Fleming Foods of Tex. v. Rylander*, 6 S.W.3d 278, 284 (Tex. 1999). In making this determination, courts should look to the plain meaning of the words used in the statute. *See Fireman's Fund County Mut. Ins. Co. v. Hidi*, 13 S.W.3d 767, 768-69 (Tex. 2000). We presume that every word was deliberately chosen and that excluded words were left out purposely. *USA Waste Servs.*, 150 S.W.3d at 494. When determining legislative intent, the entire act, not isolated portions, must be considered. *Jones v. Fowler*, 969 S.W.2d 429, 432 (Tex. 1998). We may also consider the "object sought to be attained" by enacting the statute, the "circumstances under which the statute was enacted," the "consequences of a particular construction," and the interpretations of the statute made by an agency. Tex. Gov't Code Ann. § 311.023 (West 2005); *see City of Austin v. Southwestern Bell Tel. Co.*, 92 S.W.3d 434, 442 (Tex. 2002). Moreover, so long as

7

the interpretation is reasonable and consistent with the statute, we give weight to an agency's interpretation of a statute that it is charged with enforcing. *Tennessee Gas Pipeline Co. v. Rylander*, 80 S.W.3d 200, 203 (Tex. App.—Austin 2002, pet. denied).

Some of the issues also concern whether the Commissioner's order is supported by substantial evidence. *See* Tex. Gov't Code Ann. § 2001.174 (West 2000) (allowing court to reverse agency determination if party's substantial rights have been prejudiced because determination is not supported by substantial evidence). When deciding whether an agency determination is supported by substantial evidence, we are prohibited from substituting our judgment for the agency's "as to the weight of the evidence on questions committed to agency discretion." *Cities of Abilene, San Angelo, & Vernon v. Public Util. Comm'n*, 146 S.W.3d 742, 748 (Tex. App.—Austin 2004, no pet.) (citing Tex. Gov't Code Ann. § 2001.174). In making this determination, we are not asked to verify whether "the agency reached the correct conclusion, but whether some reasonable basis exists in the record for the agency's action." *Id.* Further, we presume that an agency's order is supported by substantial evidence, and the complaining party has the burden of overcoming that presumption. *See City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 185 (Tex. 1994). In fact, the evidence may actually preponderate against the Commission's finding and be upheld as long as there is enough evidence to suggest that the Commission's "determination was within the bounds of reasonableness." *Cities*, 146 S.W.3d at 748.

**DISCUSSION**

Scheffey raises five issues on appeal. First, he argues that the JUA did not have the authority to impose a surcharge. Second, he asserts that even if the JUA had the requisite authority, the surcharge imposed was improper because it was unreasonably excessive and unfairly

8

discriminatory. Third, he contends that the surcharge was an unauthorized rate modification because the surcharge was not properly filed with or approved by the Board of Insurance ("Board").[5] Fourth, he asserts that the surcharge was improperly imposed on him without his consent, which he insists was required by statute. In the same issue, he argues that the JUA's reliance on prior surcharges imposed on physicians as support for the surcharge at issue in this case was inappropriate because all of the other physicians consented to the surcharges. Finally, he insists that the Commissioner's order is not supported by substantial evidence. We will address Scheffey's claims in the order presented.

**The JUA's Authority**

In his first issue on appeal, Scheffey argues that the JUA Act does not grant the JUA the authority to impose surcharges on its policyholders. Scheffey notes that the phrase "surcharge" is not found in the provisions of the JUA Act and argues that if the legislature had intended to allow the JUA to impose surcharges on policyholders, it would have also listed that option in the JUA Act. *Cf.* Act of May 27, 1991, 72d Leg., R.S., ch. 242, § 5.02, 1991 Tex. Gen. Laws 939, 999 (authorizing imposition of premium surcharge when renewing certain property and casualty insurance policies if insured filed two or more claims in preceding policy year but limits surcharge to no more than ten percent of total premium), *repealed by* Act of May 20, 2003, 78th Leg., R.S., ch. 1274, § 26, 2003 Tex. Gen. Laws 3611, 4138.

Further, Scheffey notes that the JUA Act does authorize the JUA to impose specific costs on its policyholders and on its members and argues that, by listing these costs, the legislature

---

[5] The Department of Insurance used to be called the Board of Insurance. *See Old Am. County Mut. Fire Ins. Co. v. Sanchez*, 149 S.W.3d 111, 118 (Tex. 2004). Because many of the statutes involved in this case refer to the Board, we will refer to the Board rather than the Department.

excluded the possibility of imposing additional costs. *See* Former Tex. Ins. Code art. 21.49-3, § 4(b)(3). Specifically, the JUA Act authorizes the JUA to impose a policyholder's stabilization reserve-fund charge on its policyholders on an annual basis. *Id.* art. 21.49-3, §§ 4A, 4B. If the JUA experiences a deficit as the result of its yearly operations, it is authorized to recover for that deficit from the reserve fund. *Id.* art. 21.49-3, § 4(b). The JUA Act also authorizes the JUA to impose additional assessments on all of its policyholders and on all of the companies that are members of the JUA if there are insufficient funds in the reserve fund to fully cover the JUA's deficits. *Id.* art. 21.49-3, §§ 4(b)(3), 5(a), 5(b).

Moreover, Scheffey notes that the failure to pay a surcharge is not included in the list of statutorily authorized justifications for the JUA denying coverage. The list provides that the JUA may withhold coverage if the policyholder does not meet certain underwriting standards or fails to pay any applicable "uncontested premium, policyholder stabilization reserve fund charge, or assessment due from the applicant for prior insurance." *See id.* § 4(a)(2) (specifying that JUA "shall" provide coverage for policyholder once it determines that certain prerequisites are satisfied); *see also* Tex. Gov't Code Ann. § 311.016 (West 2005) (providing that unless context necessarily requires different construction, word "shall" will be construed as imposing duty).

In addition to noting that the ability to impose a surcharge is not listed in the JUA Act, Scheffey also insists that the power to impose a surcharge cannot be implied from the limited powers bestowed on the JUA by statute. *See* Former Tex. Ins. Code art. 21.49-3, § 3(b) (authorizing JUA to issue insurance policies, underwrite insurance, pay insurance losses, "accept and refuse the assumption of reinsurance from its members," and "cede and purchase reinsurance"). Moreover,

10

Scheffey argues that by imposing the surcharge, the JUA is attempting to improperly recover from Scheffey the value of the claims paid on his behalf.

As additional support for his argument that the JUA has no authority to impose a surcharge, Scheffey notes that several of the documents relevant to the administration of the JUA do not contain the term "surcharge" or reference the surcharge schedule. First, he points to the JUA's plan of operation, which the JUA was statutorily required to develop to provide for the administration of medical liability insurance including the imposition of assessments on policyholders. *See* Former Tex. Ins. Code art. 21.49-3, § 3(c); *see also* 28 Tex. Admin. Code §§ 5.2001-.2006 (2007) (detailing JUA's plan of operation). Next, Scheffey refers to the JUA's rate manual, which contains the classifications and rates used by the JUA for underwriting liability insurance, and the JUA's policy form.

For the reasons that follow, we disagree with Scheffey's contention that the JUA has no authority to impose a surcharge. Although it is true that the portions of the JUA Act detailing the manner in which the JUA may recover deficits it sustained by providing insurance do not mention that the JUA may impose a surcharge, that failure would not seem to be determinative of whether the JUA may alter the rate it charges an individual policyholder to account for the fact that insuring a particular policyholder carries a significantly increased level of risk to the JUA. In fact, the JUA Act specifically incorporated other former provisions of the insurance code (subchapter 5(B)) that allowed for the imposition of a surcharge to account for this type of elevated risk.[6] Specifically, section 4(b)(1) provided, in relevant part, as follows:

---

[6] Because the JUA Act incorporated various provisions of the insurance code authorizing surcharges, there is no need to determine whether the authority to impose a surcharge can be implied from the specific powers listed in the JUA Act.

11

> The rates, rating plans, rating rules, rating classifications, territories, and policy forms applicable to the insurance written by the [JUA] and statistics relating thereto *shall be subject to Subchapter B of Chapter 5 of the Insurance Code*, as amended.

Former Tex. Ins. Code art. 21.49-3, § 4(b)(1) (emphasis added).

One of the provisions of subchapter 5(B) that is relevant to this appeal is former article 5.15-1, which applied "to the making and use of insurance rates by every insurer licensed to write or engaged in writing professional liability insurance for any physician or health care provider including rating organizations, acting on behalf of insurers." *See* Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 31.01, 1977 Tex. Gen. Laws 2039, 2054, *amended by* Act of June 3, 1987, 70th Leg., 1st C.S., ch. 1, § 2.05, 1987 Tex. Gen. Laws 1, 8, *amended by* Act of May 24, 1989, 71st Leg., R.S., ch. 1027, §§ 15-16, 1989 Tex. Gen. Laws 4128, 4135 ("Former Tex. Ins. Code art. 5.15-1"), *repealed by* Act of May 24, 2005, 79th Leg., R.S., ch. 727, § 18(e), 2005 Tex. Gen. Laws 1752, 2186 (repealing most of art. 5.15-1). It authorized insurers to establish group or classification rates but also authorized insurers to establish individual rates. Specifically, article 5.15-1 provided, in relevant part, as follows:

> For the establishment of rates, risks may be grouped by classifications, by rating schedules, or by any other reasonable methods. *Classification rates may be modified to produce rates for individual risks* in accordance with rating plans which establish standards for measuring variations in hazards or expense provisions, or both.

Former Tex. Ins. Code art. 5.15-1, § 3(b) (emphasis added). Moreover, it also stated that no language in subchapter 5(B) shall be construed as "preventing the filing of different rates for risks in a given classification or modified rates for individual risks made in accordance with rating plans." *Id.* § 4(b)

12

(emphasis added). In addition, former article 5.15-1 specifically allowed insurers to impose surcharges, as part of an individual rate, "against a health care provider or physician." *Id.* § 9.[7]

Moreover, the fact that the JUA's plan of operations, the JUA's rate manual, and the JUA's policy form do not specifically mention a surcharge would not seem to prohibit the JUA from imposing a surcharge. The failure to list a power in certain agency documents cannot nullify a power bestowed on an agency by the legislature. Furthermore, although they do not specifically mention a surcharge, both the policy form and the JUA's plan of operation state that premiums will be calculated in accordance with the JUA Act, which we previously determined incorporated certain statutory provisions authorizing surcharges. *See* 28 Tex. Admin. Code § 5.2004(a)(6) (provision of plan specifying that rates shall be calculated in accordance with requirements of JUA Act). Additionally, as discussed previously, the JUA's application form specifically states that the JUA may impose a surcharge.

Because the plain language of the JUA Act incorporated various provisions of the insurance code in effect during the time relevant to this appeal that specifically allowed for the

---

[7] Scheffey argues that although former subsection 4(b)(1) of the JUA Act referenced the subchapter of the insurance code allowing for individual rates and surcharges, section 4(b)(1) also stated "that if any article of [the referenced] subchapter is in conflict with any provision of the Act, this Act shall prevail." Former Tex. Ins. Code art. 21.49-3, § 4(b)(1); *see also* Former Tex. Ins. Code art. 5.15-1, § 3(b) (allowing for individual rates), § 9 (allowing for imposition of surcharges). In light of this language and the fact that the JUA Act does not contain the term "surcharge" in any of its provisions, Scheffey argues that the authority to impose a surcharge found in former article 5.15-1 conflicts with the terms of the JUA Act and must, therefore, yield to the directives of the JUA Act.

We disagree. The JUA Act did not contain any language specifying that the JUA is prohibited from charging individual policyholders higher premiums to account for the risk of insuring individuals with significant claim histories. Moreover, the incorporating language of subsection 4(b)(1) was not limited to certain provisions of subchapter 5(B). For these reasons, we do not believe that the surcharge provisions of former article 5.15-1 conflict with any portion of the JUA Act.

13

imposition of surcharges and individualized rates, we conclude that the JUA had the authority to impose a surcharge on its policyholders and overrule Scheffey's first issue on appeal.

**The Commissioner Properly Found that the Surcharge did Not Violate the Insurance Code**

In his second issue on appeal, Scheffey argues that even if the JUA Act specifically incorporated the former provisions of the insurance code allowing for the imposition of a surcharge, the surcharge imposed by the JUA was still improper because it did not fully comply with all of the incorporated statutory requirements. *See* Former Tex. Ins. Code art. 5.15-1, § 3; *see also* Tex. Gov't Code Ann. § 2001.174(2)(a) (West 2000) (providing that court may reverse agency's order if its findings, inferences, conclusions, or decisions are contrary to requirements of statute). Specifically, Scheffey argues that the surcharge did not comply with the requirements of former article 5.15-1 because it was unreasonable, excessive, and unfairly discriminatory.

The Commissioner made explicit findings and one conclusion regarding these assertions. In finding 44, the Commissioner stated that "[t]here is a reasonable degree of competition in Harris County and Texas for the classification of orthopedic surgeons' professional medical liability insurance coverage." In finding 45, the Commissioner stated that the surcharge "does not unfairly discriminate against Dr. Scheffey, and it is reasonable, considering his past loss experience and expected future experience. It is neither excessive nor inadequate." In conclusion 10, the Commissioner echoed these findings by concluding that the surcharge was fair and reasonable and not excessive, inadequate, or unfairly discriminatory. We review these findings and conclusion to see if they are supported by substantial evidence and are not contrary to relevant statutory requirements. *See* Tex. Gov't Code Ann. § 2001.174(2) (West 2000) (proving that court may reverse

14

agency's order if its findings, inferences, conclusions, or decisions are contrary to requirements of statute or not supported by substantial evidence).

We conclude that the Commissioner properly found that the surcharge did not unfairly discriminate against Scheffey. The amount of the surcharge was calculated by utilizing the surcharge schedule, which applied to all physicians and surgeons that had policies through the JUA. Moreover, under the terms of the schedule, the amount of the surcharge imposed on a policyholder will be the same as the surcharge imposed on another policyholder in the same class that has the same number and types of claims filed against him.

We also conclude that the Commissioner's determination that the surcharge was reasonable, and therefore not excessive, is supported by substantial evidence. A rate can be unreasonable if it is too high or too low for the coverage provided. However, under the former provisions of the insurance code, the price charged is not the only factor to be considered when determining whether a rate is unreasonably high. The former provisions of the insurance code also required proof that "a reasonable degree of competition does not exist in the area with respect to the classification to which the rate is applicable" before a rate was considered unreasonably high. Former Tex. Ins. Code art. 5.15-1, § 3(c).[8]

_____

[8] The relevant subsection reads, in its entirety, as follows:

Rates shall be reasonable and shall not be excessive or inadequate, as defined in this subsection, nor shall they be unfairly discriminatory. No rate shall be held to be excessive unless the rate is unreasonably high for the insurance coverage provided and a reasonable degree of competition does not exist in the area with respect to the classification to which the rate is applicable. No rate shall be held to be inadequate unless the rate is unreasonably low for the insurance coverage provided and is insufficient to sustain projected losses and expenses; or unless the rate is unreasonably low for the insurance coverage provided and the use of the rate has or, if continued, will have the effect of destroying competition or creating a monopoly.

15

There is substantial evidence to support the determination that a reasonable degree of competition existed in the geographic region Scheffey was practicing. During the relevant time period, there were ten insurers providing medical liability insurance in Texas. Further, there were 232 orthopedic surgeons practicing in the same county as Scheffey. Of the 232 orthopedic surgeons, only three of them had coverage through the JUA. In other words, 229 of the 232 orthopedic surgeons practicing in the same county as Scheffey were able to obtain coverage in the private sector.[9]

Because there was substantial evidence in the record demonstrating that there was a sufficient degree of competition in the area, it is unnecessary to consider the evidence concerning the actual amount charged. However, in an abundance of caution and because the evidence is relevant to other issues, we note that there is substantial evidence demonstrating that the amount of the surcharge was reasonable for the coverage provided.

In particular, the JUA introduced evidence showing that the amount of the surcharge was based on Scheffey's claim history. See Former Tex. Ins. Code art. 5.15-1, § 9 (mandating that surcharges imposed on insurance policyholders may be based only "on claims actually paid by an insurer as a result of a settlement or an adverse judgment or an adverse decision of a court"). Then, the JUA introduced evidence concerning the total amount of money it paid on behalf of Scheffey and the value of the additional coverage provided through Scheffey's policies. As a result of the various

Former Tex. Ins. Code art. 5.15-1, § 3(d).

[9] In his reply brief, Scheffey argues that the fact that he had to obtain coverage through the JUA proves that there was not a reasonable degree of competition. However, this assertion confuses the existence of a market for insuring a particular type of physician with whether a particular physician can obtain coverage in that market in light of his or her individual claim history. The evidence given to the Commissioner demonstrated that there were several insurance companies providing coverage in Scheffey's geographical area and that those providers were insuring orthopedic surgeons.

claims made against Scheffey, the JUA paid indemnity claims totaling $3,176,000. In addition to providing liability coverage, the policies issued by the JUA also covered defense costs from litigation, post-judgment interest, premiums on appeal bonds, premiums on bonds to release attachments, and investigative expenses incurred while defending a claim. These additional benefits have no express monetary limit and are separate from liability coverage. In other words, under the policy terms, the JUA must cover these expenses even if the policyholder has exceeded his liability coverage. As a result of the claims filed against Scheffey, the JUA paid defense costs, fees, and expenses totaling $311,756.

Further, several witnesses testified that the amount of the surcharge was appropriate. Deputy Commissioner David Durden and the Director of the Professional Liability Division of the Department of Insurance, Kenneth McDaniel, testified that given the number and frequency of the claims filed against Scheffey and all the benefits obtained through coverage, the surcharge was reasonable and not excessive. In addition, Douglass Klein, a consulting actuary, also testified that given Scheffey's claim history, the surcharge was appropriate and fair but also related that a non-surcharged premium would have been inadequate for the coverage provided.[10]

Based on this evidence, we conclude that the Commissioner's determinations were supported by substantial evidence and not contrary to the relevant insurance code provisions.

In an alternative argument, Scheffey contends that the surcharge was improper because it was based on a flawed surcharge schedule. Specifically, Scheffey argues that the schedule was based on the loss experiences of private insurers, not the JUA, and that the schedule was written when the premium rates were significantly lower than the rates charged in the current market. Moreover,

---

[10] It is worth noting that Scheffey points to no testimony showing that the surcharge amount was unreasonable.

he argues that there was no need to impose a surcharge on him because the JUA was experiencing a surplus at the time it was imposed and, therefore, did not need to recover for any sustained losses.

We can find no fault with the fact that the JUA surcharge schedule was based on the loss experience for private insurers. Subsection (4)(b) of the JUA Act required that the "rates, rating plans, rating rules, [and] rating classifications" used by the JUA are subject to subchapter 5(B) of the insurance code, which we previously concluded authorized the JUA to impose individualized rates and surcharges. Former Tex. Ins. Code art. 21.49-3, § (4)(b)(1). Furthermore, subsection (4)(b) also specified that when determining rates, the JUA should give "due consideration to the past and prospective loss and expense experience for medical professional liability insurance within and without this state of all of the member companies of the" JUA. *Id.* In other words, the JUA Act specifically required that the JUA consider the loss experience of insurers in the private sector when determining what rates and rate modifications to impose on its policyholders. Accordingly, the fact that the surcharge schedule was based on the loss experience of private insurers is consistent with that legislative directive. Moreover, although Scheffey contends that the surcharge schedule was improper because it was based on premium rates that were significantly lower than the rates charged at the time the surcharge was assessed, the testimony discussed previously demonstrated that the calculated surcharge amount was appropriate under the circumstances.

Finally, the fact that the JUA was experiencing a surplus during the relevant time should not foreclose the JUA from charging a policyholder a higher rate when the policyholder has had a requisite number of claims settled on his behalf. The surcharges were not imposed to recover losses that the JUA had previously paid out on behalf of its policyholders. On the contrary, surcharges were imposed to account for the risk of insuring policyholders with significant claim

18

histories. *See* Former Tex. Ins. Code art. 5.15-1, §§ 3(b), 4(b) (authorizing rates based on individual risks).

Moreover, were we to accept Scheffey's argument, then policyholders with identical claims filed against them in different policy periods would be treated differently solely based on whether the JUA was experiencing a surplus or deficit at the time the claims were paid. In other words, if the JUA was experiencing a deficit, then imposing a surcharge would be permissible, but if the JUA was experiencing a surplus, no surcharge could be imposed. We cannot adopt a construction that would treat identically situated policyholders so disparately. *See* Tex. Gov't Code Ann. § 311.023(5) (explaining that courts may consider consequences of particular construction when ascertaining meaning of statute); *Railroad Comm'n v. Coppock*, 215 S.W.3d 559, 565 (Tex. App.—Austin 2007, pet. denied) (refusing to adopt interpretation that would lead to arbitrary results); *see also* Former Tex. Ins. Code art. 5.15-1, § 3(d) (prohibiting insurers from charging "unfairly discriminatory" rates).

For these reasons, we overrule Scheffey's second issue on appeal.

**The Surcharge was Not an Unauthorized Modification to a Classification Rate**

In his third issue on appeal, Scheffey argues that the Commissioner erred when he approved the JUA's (a) rate application because the rate requested was an "an unauthorized modification of a classification rate." Specifically, Scheffey argues that before an insurer may impose a rate on a policyholder that is different than the rate imposed on other policyholders belonging to that class, an insurer is required to obtain the approval of the Board. *See* Former Tex. Ins. Code art. 21.49-3, § 4(b)(2) (specifying that JUA is required to "submit, for the approval of the [B]oard pursuant to Article 5.15 of the Insurance Code, an initial filing . . . of . . . rates, rating plans,

and rating rules applicable to medical liability insurance to be written by the" JUA); *see also* Act of June 7, 1951, 52d Leg., R.S., ch. 491, art. 5.15, 1951 Tex. Gen. Laws 868, 929, *amended by* Act of April 12, 1977, 65th Leg., R.S., ch. 108, § 1, 1977 Tex. Gen. Laws 225, 225, *amended by* Act of May 27, 1991, 72d Leg., R.S., ch. 242, § 2.17, 1991 Tex. Gen. Laws 939, 962 (requiring every insurer to "file with the Board every manual of classifications, rules and rates, every rating plan and every modification of any of the foregoing which it proposes to use") ("Former Tex. Ins. Code art. 5.15"), *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 206, § 21.47(6), 2003 Tex. Gen. Laws 907, 961. However, Scheffey argues that a copy of the surcharge schedule was never filed for the approval of the Board. In addition, Scheffey contends that the JUA failed to file information relevant to the creation of the surcharge schedule as required by statute. *See* Former Tex. Ins. Code art. 5.15(a) (stating that filings with Board "shall be accompanied by . . . the information upon which the insurer supports the filing").

For the reasons that follow, we disagree with Scheffey's assertions.

First, as discussed previously, the JUA had the authority to impose individualized rates provided that the rate is "in accordance with . . . standards for measuring variations in hazards or expense provisions, or both." Former Tex. Ins. Code art. 5.15-1, § 3(b). By utilizing the claim history of a policyholder, the JUA schedule produces an individualized rate based on the risk of insuring the policyholder.

Second, a copy of the surcharge schedule was filed with the Board in 1982. Although the Board did not issue an order specifically approving the schedule, the relevant statutory scheme provided that filings given to the Board were approved by operation of law 30 days after the filing was made. In particular, former article 5.15 specified that by operation of law, "*[a]ny filing*" relevant

20

to, among other things, an insurer's rates, rating plans, or modifications to either, "shall be deemed approved unless disapproved within thirty (30) days" and further required the Board to express its disapproval of a filing in writing. Former Tex. Ins. Code art. 5.15(b) (emphasis added). The Board never disapproved of the JUA's schedule.

However, even assuming that the surcharge schedule was not deemed approved in 1982, the Board has on several occasions approved the imposition of surcharges based on the schedule and, thereby, arguably approved of the JUA's utilization of the surcharge schedule. Prior to filing the (a) rate application concerning Scheffey, the JUA filed three (a) rate applications with the Board. The applications specified that, as the result of claims that had been made against the physicians, the JUA was seeking to impose surcharges calculated using the schedule. In three separate orders, the Board approved the requested surcharges and found that the surcharges were "in compliance with [former] Article 5.15-1 and Article 21.49-3" of the insurance code.

Moreover, in 1985 the Board promulgated rules allowing the Deputy Commissioner to approve (a) rate applications. *See* Act of May 27, 1981, 67th Leg., R.S., ch. 460, § 1, 1981 Tex. Gen. Laws 2069, 2069, *amended by* Act of July 16, 1987, 70th Leg., 2d C.S., ch. 67, § 9, 1987 Tex. Gen. Laws 207, 212 (authorizing Board to adopt rules to create summary procedure for matters deemed by Board to be routine matters) ("Former Tex. Ins. Code art. 1.33"), *repealed by* Act of April 23, 1999, 76th Leg., R.S., ch. 101, § 5, 1999 Tex. Gen. Laws 486, 538; 28 Tex. Admin. Code § 1.701 (2007) (specifying that Board has determined that certain matters are routine matters); 17 Tex. Reg. 4539 (1992) ("Former 28 Tex. Admin. Code § 1.702(4)") (listing approval of (a) rate applications as routine matter), *amended by* 28 Tex. Reg. 3952 (2003); 17 Tex. Reg. 4539 (1992) ("Former 28 Tex. Admin. Code § 1.703(2)(B)") (specifying that Deputy Commissioner of

21

Casualty Insurance is responsible for approving (a) rate applications), *amended by* 28 Tex. Reg. 3952 (2003); 9 Tex. Reg. 5542 (1984) ("Former 28 Tex. Admin. Code § 5.1001") (detailing procedure for approving (a) rate applications), *repealed by* 18 Tex. Reg. 4617 (1993). Under this summary procedure, the Deputy Commissioner has approved seventeen (a) rate applications, including the one relevant in this appeal, that were based on the JUA's surcharge schedule.

Regarding Scheffey's claim that the JUA should have filed information supporting the schedule when it originally filed the schedule with the Board, former subarticle 5.15(a) did place a burden on insurers to file information supporting their filing. *See* Former Tex. Ins. Code art. 5.15(a). However, the statute did not condition the Board's approval of the application on the insurers fulfilling that obligation. Rather, as discussed previously, the statute created a default position of approval by deeming a filing "approved" unless the Board specifically disapproved of the filing in writing. *Id.* art. 5.15(b). Stated differently, filings without supporting documentation would also be deemed approved unless specifically disapproved. Moreover, it is worth nothing that when the JUA sought permission to impose a surcharge on Scheffey, it filed an additional copy of the surcharge schedule as well as evidence of Scheffey's claim history as support for the proposed surcharge.

For the reasons previously given, we conclude that the surcharge schedule was approved by the Board and that, consequently, Scheffey's (a) rate, which was based on the schedule, was not an impermissible modification to Scheffey's classification rate. Accordingly, we overrule Scheffey's third issue on appeal.[11]

_____

[11] Alternatively, Scheffey contends that even if a surcharge may be imposed, the application form specifies that the JUA is required to obtain the approval of the Board before imposing the surcharge. Because the JUA did not obtain approval by the time the renewal payment was due, Scheffey insists that he was not required to pay the surcharge as a condition to his policy being renewed.

22

**Scheffey's Consent was Not Required**

In his fourth issue, Scheffey argues that even if the JUA had the authority to impose a surcharge on its policyholders, the JUA was obligated to obtain his consent prior to imposing the surcharge. In making this assertion, Scheffey refers to the portion of the JUA Act specifying that the rates charged by the JUA are subject to the requirements of subchapter 5(B) of the insurance code. *See* Former Tex. Ins. Code art. 21.49-3, § 4(b)(1). Scheffey asserts that even if the JUA could impose a surcharge under the relevant provisions of former article 5.15-1, *see* Former Tex. Ins. Code art. 5.15-1, §§ 3(b), 4(b), 9, the surcharge must still comply with the requirements of former article 5.15 of subchapter (B), which applied "to the filing of rates and rating information" and were incorporated by former article 5.15-1, *see* Former Tex. Ins. Code art. 5.15-1, § 4(a). One of the provisions of former article 5.15 required an insurer to obtain the consent and signature of a policyholder prior to imposing a rate or premium that is greater than the approved rate. *See* Former Tex. Ins. Code art. 5.15(c). In light of these statutory cross-references, Scheffey asserts that the JUA was obligated to obtain his consent prior to assessing the surcharge.

---

We disagree with this assertion. Scheffey's argument might be relevant to the timing of the payment of the surcharge but does not seem relevant to a determination of whether he is in fact obligated to pay the surcharge. In other words, it might be the case that a policyholder is not obligated to pay a surcharge until that surcharge has actually been approved, but nothing in the statutory scheme indicates that the failure to have the rate approved by the renewal date forecloses the possibility of imposing a surcharge on a policyholder. Moreover, the general manager of the JUA testified that it is the general practice of the JUA to inform policyholders that they may be subject to a surcharge prior to seeking approval for the surcharge in an effort to conserve the Board's time and resources. Essentially, if, after learning of the possible surcharge, a policyholder elects to not renew his policy with the JUA, there would be no need to have the surcharge approved.

Even assuming that it would be improper to require a policyholder to pay a surcharge as a condition for renewal prior to approval, that did not occur in this case. Scheffey appealed the imposition of the surcharge, and the Commissioner suspended the surcharge until a final resolution was reached. It was only after the Deputy Commissioner and Commissioner approved the (a) rate application that Scheffey became obligated to pay the surcharge.

23

We disagree with Scheffey. The statutory scheme in effect during the relevant time seems to describe two different methods in which the rate or premium that a policyholder is charged may be increased. The first method—(a) rate applications—was discussed previously. *See* Former Tex. Ins. Code art. 5.15(a), (b); Former Tex. Ins. Code art. 5.15-1, §§ 3(b), 4(b), 9. This method allows an insurer to charge policyholders a modified rate to account for "individual risks" provided that the modification is based on standards, like a surcharge schedule, that measure "variations in hazards or expense." Former Tex. Ins. Code art. 5.15-1 § 3(b). This method also requires that the proposed rate be filed for approval. Former Tex. Ins. Code art. 5.15(a).

The second method is found in former subarticle 5.15(c), which provides as follows:

> It is expressly provided, however, that *notwithstanding any other provision of this subchapter to the contrary*, a rate or premium for such insurance greater than the standard rate or premium that has been approved by the Board may be used on any specific risk if:
>
> > (1) a written application is made to the Board naming the insurer and stating the coverage and rate proposed;
> >
> > (2) the person to be insured or person authorized to act in relation to the risk to be insured consents to such rate;
> >
> > (3) the reasons for requiring such greater rate or premium are stated in or attached to the application;
> >
> > (4) the person to be insured or person authorized to act for such person signs the application; and
> >
> > (5) the Board approves the application by order or by stamping.

*Id.* art. 5.15(c) (emphasis added). The use of the italicized phrase quoted above indicates that by enacting subarticle 5.15(c), the legislature was authorizing an additional manner under which insurers could impose a higher rate on their policyholders. Under this method, an insurer has the

24

authority to negotiate with a policyholder and charge a higher premium provided that the insured consents to the increase. Further, unlike (a) rate applications, there does not appear to be any requirement that the proposed modification be calculated using standards for measuring individual risks or that information supporting the modification be filed with the application. *Compare* Former Tex. Ins. Code art. 5.15-1, § 3(b), *and* Former Tex. Ins. Code art. 5.15(a), *with id.* art. 5.15(c).

The construction of former article 5.15 as describing two different methods is consistent with the Board's interpretation of the statute. As discussed previously, the Board issued rules allowing for (a) rate applications and other applications to be approved by the Deputy Commissioner. Former 28 Tex. Admin. Code § 1.702. These rules distinguished between (a) rate applications and consent-to-rate applications. *Id.* § 1.702(4), (6). In particular, former rule 1.702 explained that (a) rate applications are those applications that are filed under the authority of former article 5.15 and that seek modifications to the rates that *physicians* and casualty insurance policyholders are charged. *Id.* § 1.702(4). Furthermore, the rule explains that consent-to-rate applications are those applications that are filed under the authority of former article 5.15(c), which requires the consent and signature of the policyholder, and that seek modifications to the rates that casualty insurance policyholders, but not physicians, are charged.[12] This distinction is also found

---

[12] The relevant language of the rule states that the following activities are designated for summary disposition:

> (4) Subchapter B, *(a) rates*. Average (a) rate applications filed for the types of insurance specified in the Insurance Code, Articles 5.13 and 5.15-1, pursuant to the Insurance Code, Article 5.15;
>
> . . .
>
> (6) Subchapter B, *consent to rate*. Applications to charge a rate or premium greater than the standard rate or premium greater than the standard rate or premium approved by the Board for the types of insurance specified in the Insurance Code, Article 5.13,

25

in former rule 1.703, which assigns the authority to approve the two types of applications to the Deputy Commissioner. *Id.* § 1.703(2)(B), (D). Moreover, the rule describing the manner in which the Deputy Commissioner may approve an (a) rate filing does not condition approval on the insurer having obtained the consent of the policyholder. Former 28 Tex. Admin. Code § 5.1001.

The Board also implemented this distinction when it processed the two types of applications. A document utilized by the Board, entitled "Processing Medical (A) Rates and Consent-To-Rates," distinguished between the two types of applications when describing the various procedural steps that must be complied with as part of the approval process. Regarding (a) rate applications, the document states that the applications must be reviewed and approved by an insurance specialist. Unlike (a) rate applications, for consent-to-rate applications, the document specifies that approval by a specialist is required only if the requested rate is more than double the standard rate. Moreover, for consent-to-rate applications only, the document instructs the reviewer to verify that the policyholder consented to and signed the application.

Finally, this construction seems correct when considered in the context of the JUA. The purpose of the JUA is to provide insurance coverage to individuals who are unable to obtain coverage through the private market. Accordingly, the JUA will often provide coverage for individuals whose claim histories are so extensive that private insurers would not insure them. Further, provided that an existing policyholder pays their required fees and meets certain

---

pursuant to the Insurance Code, Article 5.15[(c)].

Former 28 Tex. Admin. Code § 1.702 (4), (6) (emphases added); *see also* Tex. Ins. Code Ann. art. 5.13 (West Supp. 2007) (pertaining to writing of casualty insurance and specifically stating that provision did not apply to writing of professional liability insurance).

underwriting standards, the JUA is required to renew the policyholder's coverage. Former Tex. Ins. Code art. 21.49-3, § 4(a)(2).

In light of the plain statutory language, the Board's reasonable construction of the statute, and the object sought to be attained by enacting the JUA Act, we are persuaded that former section 5.15 lists alternative methods by which insurers may impose individual rates and that a policyholder's consent is not required for (a) rates.[13] Moreover, under Scheffey's interpretation, it would essentially be impossible for the JUA to ever impose a surcharge. No matter how significant a policyholder's claim history, the policyholder would have to consent to the surcharge. However, the policyholder would have no incentive to ever consent to an increased rate because the JUA could not condition the renewal of the policyholder's policy on the payment of the surcharge. In other words, the JUA would be required to cover a policyholder with a shockingly high number of claims filed against him provided that the policyholder meets certain underwriting standards, pays the standard premium, pays the annual reserve fund charge, and pays an assessment imposed on all policyholders to cover the JUA's annual deficit, if any. *See Lowe v. Rivera*, 60 S.W.3d 366, 369 (Tex. App.—Dallas 2001, no pet.) (stating that statutes should not be construed in manner that leads to absurd results when more reasonable construction is available).

In a related assertion, Scheffey argues that the 19 prior approvals by the Board and the Deputy Commissioner have no relevance to the surcharge imposed on him because the

---

[13] This supposition is supported by the testimony of the general manager of the JUA, Joe Chilton, who stated that the surcharge schedule was necessary because unlike private insurers, the JUA, as the insurer of last resort, is prohibited from canceling coverage for high risk policyholders. In other words, the JUA was required to provide coverage regardless of the number of claims filed against a policyholder. Further, Chilton testified that the schedule was created because "there had to be some consideration given to rating those with multiple claims."

physicians involved in those cases all "consented" to the surcharges by paying them without contesting their legality.

We disagree with Scheffey's contention. The prior approvals are relevant to the present case because in those previous decisions, the Board approved the utilization of the schedule to produce surcharges for individual policyholders. Moreover, although the physicians' consent may have been relevant to whether they chose to delay payment by appealing the surcharge, their consent was not required because the proposed modifications were made through the (a) rate application process, not the consent-to-rate process. Further, we see no reason to conclude that the Board or the Deputy Commissioner would review the applications differently simply because the physician did not consent to the increased rate.

For the reasons previously given, we overrule Scheffey's fourth issue on appeal.

**The Commissioner's Order is Supported by Substantial Evidence**

In his final issue on appeal, Scheffey contends that the Commissioner's order is not supported by substantial evidence. *See* Tex. Gov't Code Ann. § 2001.174. In making his claim, Scheffey specifically challenges several of the Commissioner's findings of fact and conclusions of law.[14] Several of the challenges involve similar arguments. For this reason, we will group the challenges together where appropriate.

_____

[14] As an additional argument, Scheffey also asserts that the Commissioner erred by failing to adopt his proposed findings of fact and conclusions of law because those proposals were supported by substantial evidence. However, in conducting a substantial evidence review, we are limited to determining whether the Commissioner's order, findings, and conclusions are supported by the evidence. For this reason, we need not address Scheffey's contention.

28

*Specific Challenges*

Scheffey argues that findings 13, 14, and 15 and conclusion 4 are not supported by substantial evidence. The findings relate that the JUA filed an (a) rate application regarding Scheffey, that the Department of Insurance's staff recommended approving the application, and that the Deputy Commissioner approved the application. Conclusion 4 states that the JUA was authorized to impose a surcharge by the former provisions of the insurance code.

Scheffey also attacks findings 28, 29, 30, 31, 32, 33, 34, and 35. These findings relate that it was the general practice of the JUA to inform a physician weeks before his renewal deadline that a surcharge might be imposed on him and then file an (a) rate application with the Board seeking permission to impose the surcharge. These findings also describe the details of the surcharge schedule, the manner in which Scheffey's surcharge was calculated, the history of the creation of the surcharge schedule, the purpose of the schedule, the fact that the schedule was based on actual claims paid by the JUA, and the number of policyholders that the JUA has insured.

In challenging these findings, Scheffey does not contest the factual underpinnings of these statements or contradict the accuracy of the findings. Instead, he asserts that the findings are deficient because the JUA does not have the authority to impose a surcharge and because the surcharge schedule was not approved by the Board.

However, as discussed in the prior sections, the former provisions of the insurance code specifically authorized insurers, including the JUA, to impose individual rates and surcharges on its policyholders. Further, we previously concluded that the JUA surcharge schedule was approved by the Board.

Scheffey also challenges findings 16, 17, and 18. These findings state that all of the various renewal applications Scheffey signed over the years contained a clause notifying him that his policy was subject to potential surcharges; that through the coverage it provides, the JUA was obligated to defend a policyholder if a claim was made against him; and that the JUA was required to obtain the consent of a policyholder prior to settling a claim.

Scheffey contends that the findings are inadequate because they do not account for the facts that the JUA's authority to impose a surcharge is not mentioned in the JUA's plan of operation or related policy forms.

The alleged omissions have no bearing on the sufficiency of the evidence supporting the disputed findings. In other words, the Commissioner's failure to include in his findings that the surcharge is not mentioned in various JUA documents is not relevant to whether there is a reasonable basis supporting the Commissioner's statements concerning the clause in the JUA's applications and the JUA's responsibility for defending its policyholders. Moreover, as discussed previously, the failure to include the word "surcharge" in some of its documentation cannot prohibit the JUA from exercising a power specifically bestowed on it by the legislature.

In addition to his prior complaints, Scheffey also challenges findings 6, 19, 20, 21, 23, 24, 25, 26, and 27. These findings identify the attorney hired by the JUA to defend Scheffey during his various lawsuits and state that, prior to agreeing to settle his claims, Scheffey was informed that the settlements would lead to a premium increase but that Scheffey did not inquire about how the new premium would be calculated. Further, the findings specify that Scheffey ultimately agreed to spread his settlements over more than one policy period but never inquired about whether spreading the settlements would qualify as more than one claim. The findings also list the

30

liability coverage Scheffey had when the relevant claims were made against him, relate the details of the various settlements and litigation expenses that the JUA paid on behalf of Scheffey, and describe how the settlement amounts were spread over several policy periods. Additionally, the findings relate that because the settlement of the Dunstan and Oseguera lawsuits was spread over more than one policy period, the JUA, in effect, paid six claims on behalf of Scheffey. Finally, the findings state that after the claims were settled, the JUA sent Scheffey a renewal letter informing him that he would be required to pay a surcharge and that a copy of the surcharge schedule was attached to the letter.

Scheffey asserts that these findings are improper because they do not address the fact that prior to receiving the renewal letter, he had never been provided a copy of the surcharge schedule. Scheffey also contends that the findings are inadequate because they do not account for the fact that prior to his claims being settled, he was not informed that spreading the payment of his settlements over more than one policy period would be treated as additional claims having been filed against him.

The disputed findings are adequately supported by the record. Although the findings do not specifically refer to Scheffey's testimony that he was unaware of the existence of the schedule until it was mailed to him, nothing in the disputed findings contravenes that testimony. Further, Scheffey did testify that prior to the JUA settling any of the claims made against him, he was informed that the settlement of three or more claims within a four-year period would subject him to an additional charge. In addition, Scheffey testified that he was aware that the various applications and renewals that he had signed over the years contained a clause warning policyholders that they may be subject to surcharges, and Scheffey was given a copy of the schedule 90 days before his

31

renewal date. Moreover, Scheffey refers to no legal basis that would have conditioned the JUA's ability to impose a surcharge on the JUA providing its policyholders with more than 90 days' notice of the potential surcharge.

The JUA's determination regarding the number of claims paid is also supported by the evidence in the record. There is no dispute that Hardman filed one claim against Scheffey and that the JUA paid to settle that claim. As for the Dunstan and Oseguera allegations, there is substantial evidence to support the Commissioner's finding that the JUA settled three claims made by Dunstan and two claims made by Oseguera. Wayne Witmer, an employee for the member company that issued a policy to Scheffey on behalf of the JUA, testified that although Dunstan and Oseguera each filed only one lawsuit, they both alleged multiple acts of medical malpractice. Witmer also testified that the only reason it was possible to spread the Dunstan and Oseguera settlements over several policy periods was because Dunstan and Oseguera both alleged numerous acts of malpractice with occurrence dates in different policy periods. Conversely, he testified that if Dunstan and Oseguera had alleged single acts of malpractice, the JUA would not have been able to spread the settlements over multiple policy periods. In other words, Scheffey would not have received the benefit of spreading the payment of the lawsuit over several periods and would have exhausted his coverage for single occurrences. Further, three individual medical-malpractice payment reports were filled out regarding Scheffey's treatment of Dustan, and two were filled out regarding Scheffey's treatment of Oseguera. These reports described multiple acts of alleged malpractice with unique occurrence dates. In addition, Scheffey testified that he performed or helped perform three distinct surgeries on Dunstan and that he performed multiple surgeries on Oseguera.

Scheffey also contests the factual basis for findings 36, 37, 38, and 39, which state

32

that, since 1983, the JUA has filed 19 (a) rate applications seeking approval to impose surcharges on various physicians and that the amount of the requested surcharges was calculated using the JUA's schedule. The findings also relate that all 19 applications were approved by either the Board or the Deputy Commissioner. In addition, the findings specify that the JUA applies the schedule to all of its physicians.

Scheffey complains that the physicians involved in these (a) rate applications consented to the increased rates, and therefore, the applications cannot be used as prior precedent to justify the surcharge imposed on Scheffey. However, as previously described, there is no requirement that a physician consent to an (a) rate application before a modified rate may properly be imposed on a policyholder. Therefore, the fact that the Commissioner did not specify that the other physicians consented to the surcharge does not render the finding deficient.

In addition to his previous challenges, Scheffey also attacks findings 44 and 45 and conclusion 10. The findings list the number of orthopedic surgeons in Texas and in Harris County, the number of orthopedic surgeons insured by the JUA, and the number of private insurers offering medical malpractice coverage in Texas. Additionally, the findings state that, at the time, there was a reasonable degree of competition for medical malpractice coverage, and the findings and conclusion state that the surcharge imposed on Scheffey is reasonable, not unfairly discriminatory, and not excessive.

Scheffey argues that the findings and the conclusion are not supported by the evidence because the surcharge was unreasonable, discriminatory, and excessive. We discussed these assertions previously, and for all the reasons listed in that section, we conclude that there was substantial evidence supporting the findings and the conclusion.

In addition, Scheffey challenges findings 40, 41, 42, and 43 and conclusion 3. In attacking these determinations, Scheffey relies on a generalized assertion that the findings are not supported by the relevant evidence, law, and rules. For the reasons that follow, we disagree with Scheffey.

Finding 40 states that, in January 1993, the JUA filed an (a) rate application seeking permission to impose a surcharge on Scheffey. The finding also states that Scheffey was the first physician to contest one of the JUA's surcharges.

A copy of the JUA's filing is attached to the administrative record as an exhibit. The filing is dated January 13, 1993, and by its terms, the filing sought approval to impose a surcharge on Scheffey. Further, McDaniel testified that there was no evidence that any of the previous (a) rate applications had been contested. Moreover, the general manager of the JUA testified that Scheffey was the first physician to contest an (a) rate application.

Finding 41 provides that the JUA's and Scheffey's attorneys were given an opportunity to comment on the application and that the comments were reviewed by Kenneth McDaniel and Nancy McGrath, another Department of Insurance employee. Finding 42 specifies that McDaniel and McGrath recommended approving the surcharge.

McDaniel testified that both he and McGrath reviewed the (a) rate application and recommended that the application be approved because the surcharge was calculated in the same manner that had previously been used by the JUA and because the surcharge was based on claims paid by the JUA on behalf of Scheffey. McDaniel also prepared a memo for the Deputy Commissioner recommending that the application be approved. In the memo, McDaniel wrote that the attorneys for Dr. Scheffey and the JUA both submitted comments regarding the (a) rate

34

application and that both he and McGrath reviewed the filing and the materials submitted by the parties.

Finding 43 relates that the Deputy Commissioner concluded that he had the authority to approve the (a) rate application even though Scheffey was contesting the surcharge. The finding further specifies that the Deputy Commissioner concluded that the surcharge was reasonable and consistent with the relevant requirements of the insurance code and then approved the application.

As discussed previously, former Board rules authorized the Deputy Commissioner to approve (a) rate applications through a summary procedure, and the rules made no reference to a requirement that a policyholder consent to an (a) rate application before the modified rate may be imposed. 28 Tex. Admin. Code § 1.701; Former 28 Tex. Admin. Code § 1.702. Further, the Deputy Commissioner testified that the approval of (a) rate applications is routine and repetitive and that his approval authority was not affected by the fact that Scheffey contested the amount of the surcharge. In particular he noted that although the approval of the surcharge might be controversial to Scheffey, that fact did not deprive him of authority over the case because under section 1.701, the controversial nature of an application is relevant only if the application is controversial to individuals that are not part of the application process. *See* 28 Tex. Admin. Code § 1.701 (specifying that certain activities are appropriate for resolution through summary procedures because, among other reasons, activities are "of limited interest to persons other than those immediately involved in or affected by the proposed agency decision."). In addition, as discussed previously, the surcharge complied with the relevant statutory requirements in effect during the relevant time, and the Deputy Commissioner's testimony in the administrative hearing reflected that fact. Moreover, the stamp affixed to the (a)

rate application demonstrates that the application was approved by the Deputy Commissioner in January 1993.

Conclusion 3 specifies that former insurance code provisions authorized the JUA to file (a) rate applications. Further, the conclusion states that the Board "lawfully delegated review of such (a) rate applications to the Deputy Commissioner."

We have already discussed how the insurance code provisions in effect during the relevant time for this appeal allowed the JUA to submit applications to charge policyholders modified rates. Regarding the Board's delegation, former article 1.33 authorized the Board to designate certain activities as routine matters and to adopt rules to handle those matters by summary procedures. Former Tex. Ins. Code art. 1.33(a). Under this authority, the Board promulgated rules allowing for the summary disposition of (a) rate applications. *See* 28 Tex. Admin. Code § 1.701; Former 28 Tex. Admin. Code §§ 1.702-.705; Former 28 Tex. Admin. Code § 5.1001. Those rules were not challenged and were in effect during the time relevant to this appeal.[15]

Scheffey also challenges conclusions 5, 6, 7, 8, and 9 by asserting that the conclusions "are not supported by the law and are made contrary to such." Although he does not set out the

---

[15] In addition to his general assertion that findings 40, 41, 42, and 43 and conclusion 3 are not supported by substantial evidence, Scheffey also argues, without citation to authority or the record, that the approval of the (a) rate application was not routine or noncontroversial and that a full hearing should have been conducted. He also asserts that conclusion 3 is not supported by the law. With these assertions, Scheffey appears to be contesting the propriety of the Board's decision to promulgate rules for the summary disposition of (a) rate applications. However, in addition to failing to adequately brief these contentions, *see* Tex. R. App. P. 38.1(h), Scheffey did not properly challenge the validity of the promulgated rules, *see* Tex. Gov't Code Ann. § 2001.038 (West 2000) (authorizing party to seek declaration concerning validity or applicability of rule promulgated by agency); *see also City of Alvin v. Public Util. Comm'n*, 143 S.W.3d 872, 879 (Tex. App.—Austin 2004, no pet.) (validity challenge is test of agency's rule on procedural and constitutional grounds, including whether agency had authority to promulgate rule).

alleged inadequacies of these conclusions, we will demonstrate why the various conclusions are supported by substantial evidence and the relevant laws and rules in effect during the relevant time period.

Conclusion 5 reads, in relevant part, as follows: "Application of the JUA surcharge schedule is based exclusively upon actual claims paid by the JUA as the result of settlement, adverse judgment or adverse decision of a court relating to the insured, as required by" the former provisions of the insurance code.

The JUA surcharge schedule only allows for the imposition of a surcharge on a policyholder who has "had three (3) or more indemnity claims paid . . . as a result of a settlement or an adverse judgment, or an adverse decision of a court." Further, under the schedule, the amount of the surcharge imposed is also based on the amount of the various claims settled on behalf of a policyholder. In other words, the surcharge schedule only considers claims actually paid for the purpose of determining the amount of a surcharge. This limitation comports with the requirements of former section 9 of article 5.15-1, which specifies that a surcharge can be based "only on claims actually paid by an insurer as a result of a settlement or an adverse judgment or an adverse decision of a court." Former Tex. Ins. Code art. 5.15-1, § 9. For this reason, we conclude that conclusion 5 is consistent with the former provisions of the insurance code.

Conclusion 6 reads, in relevant part, that the purpose of the JUA surcharges is "to obtain an adequate premium for future exposure to loss from insuring a risk with unusual or unique hazards or expenses" and that this purpose comports with the former provisions of the insurance code.

37

By basing the calculation of a surcharge on a policyholder's claim history, the schedule produces rates that reflect an increase in the risk of insuring a particular policyholder. This is consistent with the statutory requirement that individualized rates be based on plans measuring variations in hazards or expenses. *See* Former Tex. Ins. Code art. 5.15-1, §§ 3(b), 4(b), 9. Further, several witnesses testified concerning the purpose of the surcharges. In particular, the general manager of the JUA, a consulting actuary, and the Deputy Commissioner testified that surcharges represent the additional charges that must be imposed in order to adequately cover the increased risk of future losses that results from insuring individuals with extensive claim histories. In other words, the surcharges are designed to ensure that an insurance company receives an adequate premium for insuring physicians with an unusually high risk of claims being filed against them. Further, as proof that surcharges are imposed only on unique risks, the general manager noted that the JUA has provided coverage for over 27,000 policyholders but only imposed a surcharge 19 times.

Conclusion 7 reads, in relevant part, as follows: "The JUA has properly obtained the approval of the State Board of Insurance, or its lawful delegate, each time it has imposed the surcharge on individual physicians." The conclusion further relates that a copy of the schedule was given to the Board when the schedule was created, that surcharge calculations based on the schedule were presented to the Board for approval on three occasions, and that the surcharges approved by the Deputy Commissioner were also based on the schedule.

A copy of the surcharge schedule was given to the Board after it was finalized by the JUA in the 1980s. After giving the Board a copy of the schedule, the JUA filed three (a) rate applications with the Board seeking approval to charge a policyholder a modified rate. These applications were approved by the Board. *See* Former Tex. Ins. Code art. 5.15(a); Former Tex. Ins.

Code art. 21.49-3, § 4(b)(2). In addition, after the power to approve the (a) rate applications was delegated to the Deputy Commissioner, the JUA filed 16 (a) rate applications, and the Deputy Commissioner approved these applications. *See* Former 28 Tex. Admin. Code § 1.703(2)(B); Former 28 Tex. Admin. Code § 5.1001.

Furthermore, the proposed surcharges in the (a) rate applications filed with the Board and the Deputy Commissioner were all based on the JUA's schedule. In fact, all 19 applications contain calculations derived from the schedule. Moreover, the Supervisor of the Medical Professional Liability Division of the Texas Department of Insurance, Charles Sobeck, testified that he utilized the surcharge schedule when reviewing the JUA's (a) rate applications.

Conclusion 8 specifies that the JUA's (a) rate application concerning Scheffey complied with the filing procedure detailed in the administrative code.

The relevant filing procedure was found in former section 5.1001(b) of title 28 of the administrative code. That provision provided that:

> All (a) rate applications must indicate the rate or rates the insurer proposes to charge and a complete description of the (a) rated exposures and pertinent date for such rate or rates. In the event the information accompanying the application is not considered sufficient to justify the proposed rates, the submission will be disapproved or the submitting insurer will be permitted to supply additional data.

Former 28 Tex. Admin. Code § 5.1001(b).

The application complied with the above requirements because it (1) detailed Scheffey's insurance coverage, his standard premium, and the amount of the requested surcharge; (2) contained a summary of the six claims that the JUA paid on behalf of Scheffey, including the

amount paid for each claim and the date each claim was paid; and (3) provided a chart showing how the number and amount of the claims paid were used to calculate requested surcharge. Furthermore, a copy of the JUA surcharge schedule was attached to the application.

Conclusion 9 states that the JUA submitted the application to the Deputy Commissioner for review as a summary procedure in accordance with the relevant requirements.

As previously discussed, the Deputy Commissioner was authorized to review (a) rate applications through a surcharge procedure. *See* Former 28 Tex. Admin. Code § 1.703(2)(B). Scheffey filed the application with the Deputy Commissioner, and the Department of Insurance's staff reviewed the application. As discussed previously, McDaniel prepared a memo recommending that the application be approved and stating that the "(a) rate application was correctly completed by the . . . JUA." McDaniel also testified that he reviewed the (a) rate application to ensure that it was completed correctly and verified that the calculations used by the JUA resulted in the surcharge requested. After receiving the recommendation from McDaniel, the Deputy Commissioner approved the application.

Finally, Scheffey argues that the final conclusion by the Commissioner, conclusion 11, is "deficient." The pertinent part of conclusion 11 provided that the surcharge was proper.

In light of our resolution of Scheffey's prior issues on appeal and our conclusion that the findings and conclusions forming the basis for conclusion 11 are supported by substantial evidence, we also conclude that the Commissioner's final conclusion is supported by substantial evidence.

40

**Interest of Justice**

In a separate argument, Scheffey asks this Court to vacate the Commissioner's order and also argues that the district court erred by failing to vacate the Commissioner's order. Essentially, Scheffey contends that the insurance code authorizes courts to vacate an order when the interests of justice require it and insists that the circumstances in this case warrant the utilization of that power.[16] The relevant provision of the insurance code provides as follows:

> (a) The filing of a petition for judicial review of an action under this subchapter does not vacate the action.
>
> (b) After notice and hearing, the court *may* vacate the action if the court finds it would serve the interest of justice to do so.

Tex. Ins. Code Ann. § 36.204 (West 2007) (emphasis added).

Assuming for the sake of argument that section 36.204 does give courts the additional power to vacate orders by the Commissioner,[17] we hold that the district court did not err. The use of the word "may" in the statute imbued the district court with the discretion to vacate the Commissioner's order when the court concluded the interest of justice required that type of extreme remedy. *See* Tex. Gov't Code Ann. § 311.016 (explaining that word "may" gives discretionary

---

[16] In making this assertion, Scheffey refers to former article 1.04 of the insurance code. *See* Act of May 27, 1991, 72d Leg., R.S., ch. 242, § 1.02, 1999 Tex. Gen. Laws 939, 939. That provision was repealed in 1999, *see* Act of April 23, 1999, 76th Leg., R.S., ch. 101, § 5, 1999 Tex. Gen. Laws 486, 538, and reenacted with the contents of the former provision recodified into multiple provisions of the insurance code, *see* Tex. Ins. Code Ann. §§ 36.201-.205 (West 2007). Because any differences between the former provision and the current provisions do not affect the parties arguments or the outcome of this appeal, we will refer to the current version of the insurance code.

[17] We note that the JUA strongly disputes that subsection (b) grants reviewing courts any power that is distinct from their power to determine whether the Commissioner's orders are supported by substantial evidence.

power). A district court abuses its discretion when it acts unreasonably, arbitrarily, or "without reference to any guiding rules or principles." *Cire v. Cummings*, 134 S.W.3d 835, 839 (Tex. 2004). In light of our conclusions that the JUA had the authority to impose a surcharge, that the surcharge imposed complied with the relevant statutory requirements, and that the Commissioner's order was supported by substantial evidence, we cannot conclude that the district court abused its discretion by failing to vacate the order.

Scheffey also argues that this Court should vacate the Commissioner's order. However, the ability to vacate an order by the Commissioner seems to be limited to the district court. The phrase "the court" found in section 36.204 refers back to sections 36.202 and 36.203, which specify that a party may seek judicial review of an action by the Commissioner in *district court*. *See* Tex. Ins. Code Ann. §§ 36.202-.203. Furthermore, the provision of the insurance code governing appellate review of an order by the Commissioner is found after section 36.204. *See id.* § 36.205. Regardless, the same justifications regarding our resolution of Scheffey's other issues on appeal would also compel us to conclude that the Commissioner's order should not be vacated.

## CONCLUSION

Having overruled all of Scheffey's issues on appeal, we affirm the judgment of the district court.

David Puryear, Justice

Before Chief Justice Law, Justices Puryear and Pemberton

Affirmed

Filed: February 15, 2008

42